294 So.2d 54 (1974)
STATE of Florida, Appellant,
v.
James Leroy CHORPENNING, Appellee.
No. 72-191.
District Court of Appeal of Florida, Second District.
May 1, 1974.
Robert L. Shevin, Atty. Gen., Tallahassee, and Baya Harrison, III, Asst. Atty. Gen., Tampa, for appellant.
Robert E. Jagger, Public Defender, Clearwater, and Karl B. Grube, Asst. Public Defender, Clearwater, for appellee.
PER CURIAM.
This is an interlocutory appeal by the state from an order suppressing two extrajudicial statements of the defendant in which he confessed to killing Mrs. Steinle.
The record contains 1194 pages and consists primarily of testimony taken at two suppression hearings.
The following facts are essentially undisputed. On December 6, 1971, at approximately 4:00 P.M., the defendant voluntarily accompanied Lieutenant Burger and Chief Nixon of the Dade City Police Department to the police station for questioning about an assault with intent to commit rape upon Mrs. Acuff. Defendant executed a written waiver of attorney form before the interrogation. Questioning continued from approximately 4:30 P.M. until 7:00 P.M., but no incriminating statements were elicited. When Burger and Nixon left to attend a night traffic court session, the defendant was placed in a detention cell (whether voluntarily or not is disputed) where he remained until sometime after 9:00 P.M.
*55 When the officers returned, the questioning continued in Chief Nixon's office. After a short period, defendant admitted complicity in the assault in general terms. Thereupon, the officers and defendant drove to the scene of the crime and specific incriminating details were discussed. Upon return to the station the defendant signed a handwritten statement and was allowed to return home. He was not placed under arrest. The Steinle murder was mentioned in the course of the proceedings, but who mentioned it is a disputed point.
The following evening the officers came to defendant's house at 7:00 P.M. and asked him to accompany them. He did so voluntarily, and the trio went to the police station where defendant was again read his Miranda rights. Questioning concerning the Steinle murder followed. After a short time, the officers asked defendant to show them the route to Mrs. Steinle's house (where the murder took place), but he apparently became lost. At some point during this journey, the officers came to the conclusion that defendant was implicated and decided to "go get a warrant." The trio thereupon drove to Judge Seaver's house, but the judge was not home.
The party then returned to the police station where defendant gave an oral confession purportedly recorded verbatim by Betty Nixon (Chief Nixon's wife) in shorthand. Later the same night Judge Henry committed the defendant to custody for the Steinle murder. He waited until the next morning to determine the proper charge in the Acuff case. The defendant was held in jail overnight.
At noon on December 8, Investigator Pittman of the State Attorney's office interrogated defendant regarding both cases, advising him of his rights several times during the proceedings. Defendant gave detailed confessions to both crimes. Toward the end of the interrogation, Pittman advised defendant of the penalty for the murder, and defendant asked to speak to Pittman privately. Lieutenant Burger left the room but Chief Nixon remained. Defendant then denied committing the crimes. At this point the public defender arrived, and the interrogation ceased.
The disputed evidence is voluminous. Defendant testified he was led to confess to crimes he did not commit for several reasons:
(1) When first interrogated he was told that Mrs. Acuff was not seriously injured and would not press charges. Chief Nixon told the defendant that he simply wanted to clear the matter up and that if defendant would confess to the Acuff assault, he would not be arrested and the matter would be dropped. Defendant believed this because he was allowed to go home that night, and he trusted Chief Nixon. He was able to confess because the officers "told" him the facts of the crime by asking him leading questions. Chief Nixon told him the Steinle murder was an old matter that he just wanted to get cleared up.
(2) Since the chief had allowed him to go home after the first confession, the defendant believed him when he said he would allow him to go home if he also confessed to the murder. Again, defendant was able to confess because the facts of the case were described to him through leading questions by the police officers.
(3) When the party went to Judge Seaver's house, the officers threatened defendant with loss of custody of his foster child. Chief Nixon told the defendant that if he refused to confess, Lieutenant Burger would advise Judge Seaver (before whom adoption proceedings were pending) to stop the adoption. Defendant thereupon said he committed the Steinle murder.
(4) While enroute to the Steinle house on the night of December 7, Chief Nixon raised his hand and defendant thought Nixon was going to strike him for refusing to cooperate. At this point he began to be afraid of Chief Nixon.
(5) The defendant also said that after his murder confession, Nixon told him that *56 he would have to remain in jail overnight and tell his story to an investigator, but that after that he would be allowed to go home permanently.
The defendant had a history of mental illness, having spent more than a year in a mental institution. He had a seventh grade education. There were several inconsistencies between the defendant's murder confession and the known facts in the case.
The officers denied the defendant's version of the events. When asked why the defendant was allowed to return home on the night of December 6, they said they "wanted to check some things in the Acuff case" before deciding whether to arrest him.
Investigator Pittman testified that he felt that the confessions given to him were free and voluntary, but he admitted that he had some "concern" about the police tactics in the case. In particular, he was concerned as to why the State Attorney's office had not been called into the case earlier.
At the hearing, the defendant testified that he did not understand that he could remain silent during the police interrogation. He also asserted that he did not understand that his confession could be used against him.
Upon the foregoing evidence the trial judge granted the defendant's motion to suppress the statements as being involuntary, insufficient in detail, coerced or illegally induced and generally unreliable in view of the defendant's apparent mental incompetence. The judge specifically stated that he found the defendant to be generally believable. The judge noted that he was not suppressing the confessions by reason of any conduct on the part of any state investigator.
A confession is admissible if it is given freely and voluntarily and is made without fear, hope of reward and promise of escaping punishment, or some other illegal influence. Williams v. State, 1940, 143 Fla. 826, 197 So. 562; Clay v. State, 1940, 143 Fla. 204, 196 So. 462. In Harrison v. State, 1942, 152 Fla. 86, 12 So.2d 307, the Supreme Court said:
"It is established that in order to render a confession voluntary or admissible, the mind of the accused should at the time it is obtained or made be free to act uninfluenced by fear or hope. If the attending circumstances or declarations of those present be calculated to delude the accused as to his true position and exert an improper and undue influence over his mind, then the confession is unlawfully obtained... ."
While advising an accused to tell the truth and to confess does not ordinarily render a confession inadmissible, where the adjuration is accompanied by an inducement or suggestion of a benefit, the resulting confession cannot stand. Frazier v. State, Fla. 1958, 107 So.2d 16. Considering the nature of the inducement, the court in that case said:
"Whether the specific language used amounts to a threat or promise of benefit depends upon the circumstances in which it is used and on warrantable inferences drawn from the language and circumstances.... The confession may be untrustworthy because it has been associated with an attraction too strong to resist. III Wigmore on Evidence, § 824."
The voluntariness of a confession must be determined from the totality of the circumstances. Williams v. State, 1945, 156 Fla. 300, 22 So.2d 821. Among the influences which may cause a confession to be held to be involuntary are persistent and prolonged interrogation, unlawful detention and the mental incapacity or ignorance of the accused. Williams v. State, Fla.App.2d 1966, 188 So.2d 320, modified on other grounds, Fla., 198 So.2d 21. The burden of *57 proving that a confession has been freely and voluntarily given lies upon the State. Reddish v. State, Fla. 1964, 167 So.2d 858.
In the instant case, the lower court determined that the confessions were involuntarily made. There is sufficient evidence in the record to support this conclusion. It is not the function of this court to substitute our judgment for that of the trier of fact.
The order suppressing the confessions is affirmed.
McNULTY, Acting C.J., and BOARDMAN and GRIMES, JJ., concur.