397 So.2d 648 (1981)
Timothy Charles PALMES, Appellant,
v.
STATE of Florida, Appellee.
No. 52045.
Supreme Court of Florida.
March 5, 1981.
Rehearing Denied May 20, 1981.
*650 B. Kenneth Vickers and Steven E. Rohan, Jacksonville, for appellant.
Jim Smith, Atty. Gen., and Carolyn M. Snurkowski, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
This cause is before the Court on appeal from a judgment of the Circuit Court of the Fourth Judicial Circuit, in and for Duval County. The appellant was convicted of murder in the first degree and sentenced to death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the conviction and sentence.
Appellant lived in an apartment with his girlfriend Jane Albert, her daughter Stephanie, and a friend, Ronald Straight. The appellant became acquainted with Ms. Albert's employer James Stone. The evidence showed that appellant, Albert, and Straight plotted the murder and robbery of Stone.
On October 3, 1976, appellant, Straight, and Albert purchased lumber, hardware, and cement from which appellant built a box large enough to hold a man's body. The next day Albert told her employer that a girl named Nancy was waiting for him at the apartment. She then called appellant to let him know that Stone was on his way. Appellant told Stephanie to answer the door and tell Mr. Stone that Nancy was waiting in the back bedroom. Ronald Straight waited behind the front door with a gun. After Stone entered the apartment, Straight directed him to the back bedroom where appellant was waiting. The two men then bound Stone's hands and feet with wire and taped his mouth. They placed a garbage bag over his head and hit him with a hammer and stabbed him approximately eighteen times. This sequence of events took about a half an hour. At one point appellant had the child, Stephanie, come into the room and observe the victim lying in the burial box, mortally wounded.
The next day appellant and Straight moved their possessions, together with the box containing the body, out of the apartment and into a rental truck. They took possession of the victim's watch, credit cards, and car. Albert took about $3100 in cash from Stone's furniture store. They spent that night at a motel. The next day appellant and Straight drove the rental truck to the Buckman Bridge and threw the box into the St. John's River. The appellant, Straight, Albert, and her daughter fled to California in the victim's automobile.
*651 Police apprehended them in California. Appellant was brought back to Florida and placed in the Duval County jail. On October 22, 1976, police officers advised him of his constitutional rights and questioned him. On October 24, 1976, the officers again advised appellant of his constitutional rights and interrogated him further. They read to him excerpts from a statement made by Jane Albert. He refused to make any statement until after he had spoken to her. Although he declined to sign a written waiver of his rights, he did not request an attorney and he voluntarily answered questions. Afterwards he showed the police officers the place on the bridge where the body was dropped. On October 28, 1976, an indictment was returned accusing appellant of murder in the first degree. On October 29, the appellant asked to see the investigating officers. After again being advised of his rights, the appellant specifically stated that he did not want to see a lawyer. He signed a waiver and made a detailed statement of his participation in the murder. The statement was recorded and signed.
At appellant's first appearance on October 23, 1976, the judge entered an order appointing the public defender to represent him. The office of the public defender never undertook representation, however, and on October 29 requested and was granted permission to withdraw from representation on the ground of conflict of interest. Appellant never met with a representative of that office. Throughout the course of his interrogation by police, he never asked to see an attorney.
Before trial, the appellant moved to suppress evidence of his confession. He argued that the confession was inadmissible because he was questioned without benefit of counsel after being indicted. The motion was denied and appellant's statement was admitted in evidence.
At trial the appellant testified that Albert committed the murder and that his participation was limited to assistance in disposing of the body. He said that he did not notify police because he wanted to protect her and that he confessed to the crime for the same reason. When the appellant attempted to further testify about the circumstances of his confession, the prosecuting attorney objected on the ground of lack of relevance. The court sustained the objection, reasoning that the admissibility of the confession had already been decided and was not relevant to any material issue to be decided by the jury.[1]
At the conference on charging the jury, the appellant requested an instruction on the crime of accessory after the fact. The court declined to give the requested instruction.
The appellant raises a number of points going to the propriety of his conviction, three of which we find merit discussion. He contends that the court erred in refusing to suppress his confession, in refusing to instruct on accessory after the fact, and in refusing to allow him to tell the jury the circumstances of his confession.

I.
The appellant contends that he was denied his fifth and sixth amendment rights to due process and the assistance of counsel because his confession was obtained after indictment and in the absence of counsel. In support of this contention he cites Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and Williams v. State, 188 So.2d 320 (Fla. 2d DCA 1966) cert. discharged, 198 So.2d 21 (Fla. 1967). Massiah v. United States concerned a defendant who, after being indicted, retaining a lawyer, pleading not guilty, and being released on bail, made incriminating statements to one of his codefendants which *652 were detected by means of a radio transmitter. The Court held the statements inadmissible under the sixth amendment guaranty of the right to assistance of counsel. Williams v. State was a case where the investigating officer,
knowing that the defendant ... had been in jail for thref weeks ... that he had already been indicted for first degree murder, and that he had a lawyer and who his lawyer was, took the defendant out of his jail cell and transported him to a small room ... in which room there was only a desk and three chairs. They went inside, closed the door, sat down... .
188 So.2d at 326. There the officers elicited an incriminating statement.
These cases do not control the situation at bar. In the instant case the defendant had already been indicted but was not yet represented by counsel. He was repeatedly advised of his right to consult with counsel and to have counsel present during questioning. The formal appointment of the public defender at first appearance did not initiate legal representation since nothing was done toward actually providing legal counsel. The interview at which appellant made the recorded confession took place at his own request. He made no request to speak to an attorney and executed a written waiver of counsel. The right to counsel during questioning can be waived. Witt v. State, 342 So.2d 497 (Fla.), cert. denied, 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 774 (1977). Investigating officers are not required to try to convince a defendant that he needs an attorney. State v. Craig, 237 So.2d 737 (Fla. 1970). We therefore hold that the court properly admitted the confession into evidence.

II.
The appellant contends that the court erred in not instructing the jury on the crime of accessory after the fact because his defense was that his only participation in the crime was in helping his girlfriend dispose of the body.
It is axiomatic that a defendant is entitled to a jury instruction on the theory of his defense. Florida courts have reversed convictions where juries were not instructed about the defenses of alibi, Davis v. State, 254 So.2d 221 (Fla. 3d DCA 1971); Watson v. State, 200 So.2d 270 (Fla. 2d DCA 1967); coercion, Koontz v. State, 204 So.2d 224 (Fla. 2d DCA 1967), entrapment, Kwasniewski v. State, 303 So.2d 373 (Fla. 1st DCA 1974); Stiglitz v. State, 270 So.2d 410 (Fla. 4th DCA 1972), justifiable homicide, Stinson v. State, 245 So.2d 688 (Fla. 1st DCA 1971); Whitehead v. State, 245 So.2d 94 (Fla. 2d DCA 1971), and withdrawal, Laythe v. State, 330 So.2d 113 (Fla. 3d DCA), cert. denied, 339 So.2d 1172 (Fla. 1976). All these defenses concern either the defendants' innocence or their legal excuse in committing a crime. None of them entail the commission of a crime other than the one charged in the indictment.
That a person committed a crime other than the one he is charged with is not a legal defense requiring a jury instruction. Furthermore, the crime of accessory after the fact is not a lesser included offense of the crime of premeditated murder. Cf. Newkirk v. State, 222 So.2d 435 (Fla. 3d DCA 1969) (accessory after the fact is a separate offense, not a lesser included offense of robbery). Therefore, the defendant was not entitled to an instruction on accessory after the fact as a lesser included offense. See State v. Anderson, 270 So.2d 353 (Fla. 1972); Brown v. State, 206 So.2d 377 (Fla. 1968). If the jury had been instructed about accessory after the fact, a conviction on that charge would not be valid since it would not be supported by the facts alleged in the indictment. Newkirk v. State, 222 So.2d 435 (Fla. 3d DCA 1969). Since the jury could not legally convict the defendant of accessory after the fact, no purpose would be served by requiring that they be instructed on the charge. Therefore, the court did not err in refusing to instruct the jury about accessory after the fact either as a defense or as a lesser included offense.

*653 III.
Finally, appellant argues that the trial court erred in sustaining the state's objection to the attempt by defense counsel to elicit from appellant testimony concerning the circumstances of his confession. He contends that by this ruling, the court kept from the jury evidence bearing on the weight to be given to the confession. The trial judge reasoned that this issue was closed once the court determined the confession was voluntary and therefore admissible. We agree that the court erred in this regard, but we conclude that the error does not require reversal.
The question of the admissibility in evidence of an extra-judicial confession is for the court to decide, based on all the circumstances of the confession. See, e.g., Brewer v. State, 386 So.2d 232 (Fla. 1980); Frazier v. State, 107 So.2d 16 (Fla. 1958); Coffee v. State, 25 Fla. 501, 6 So. 493 (1889); Simon v. State, 5 Fla. 285 (1853). Once a confession is admitted into evidence, however, the defendant is entitled to present to the jury evidence pertaining to the circumstances under which the confession was made. The reason for this rule is that it is the jury's function to determine the weight to be accorded the confession in determining guilt. See, e.g., State v. Oyarzo, 274 So.2d 519 (Fla. 1973); Graham v. State, 91 So.2d 662 (Fla. 1956); Williams v. State, 156 Fla. 300, 22 So.2d 821 (1945); Nickels v. State, 90 Fla. 659, 106 So. 479 (1925); Bates v. State, 78 Fla. 672, 84 So. 373 (1919); Sims v. State, 59 Fla. 38, 52 So. 198 (1910); Bunn v. State, 363 So.2d 16 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1373 (Fla. 1979); Williams v. State, 353 So.2d 588 (Fla. 2d DCA 1978), cert. dismissed, 372 So.2d 64 (Fla. 1979). It is conceivable that a confession, freely and voluntarily given and therefore admissible, may be untrue. Therefore the defendant must be allowed to tell the jury why he made it.
It has been said that the application of this rule requires that the evidence presented to show the voluntary nature of the confession must be presented anew for the jury's consideration. See, e.g., State v. Oyarzo, 274 So.2d 519 (Fla. 1973); Bates v. State, 78 Fla. 672, 84 So. 373 (1919). Thus it might be suggested that because appellant did not testify at the pretrial hearing on the admissibility of the confession, he was precluded from giving his personal account of the circumstances for the jury. The functions of the judge and jury, however, are different. It is not the function of the jury to reconsider whether the confession was voluntary. See, e.g., Kirby v. State, 44 Fla. 81, 32 So. 836 (1902). At trial, appellant wanted to testify about his state of mind. In the absence of evidence of threats, promises, or the like, this testimony about state of mind would have been irrelevant at the pretrial hearing. Barton v. State, 193 So.2d 618 (Fla. 2d DCA 1966), cert. denied, 201 So.2d 459 (Fla. 1967). This is because the inquiry at the pretrial hearing on the admissibility of a confession is primarily the question of voluntariness; later, before the jury, the question is what weight to give the confession in determining guilt. The defendant's state of mind is relevant to this latter inquiry. Reddish v. State, 167 So.2d 858 (Fla. 1964); Cullaro v. State, 97 So.2d 40 (Fla. 2d DCA 1957). Therefore the trial court erred in sustaining the objection.
That the trial court's ruling was in error does not necessarily require reversal of the judgment. A judgment will not be reversed unless the error was prejudicial to the substantial rights of the appellant. Padgett v. State, 84 Fla. 590, 94 So. 865 (1922); Kirby v. State, 44 Fla. 81, 32 So. 836 (1902). This long standing decisional rule has also been enacted as a statute. § 924.33, Fla. Stat. (1977). Although, in a capital case, this Court will carefully scrutinize any error before determining it to be harmless, Pait v. State, 112 So.2d 380 (Fla. 1959), it will not presume that there was prejudice. Salvatore v. State, 366 So.2d 745 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1975).
In determining whether an erroneous ruling below caused harm to the substantial rights of the defendant, an appellate *654 court considers all the relevant circumstances, including any curative ruling or event and the general weight and quality of the evidence. In other words, the court inquires generally whether, but for the erroneous ruling, it is likely that the result below would have been different. See, e.g., Campbell v. State, 227 So.2d 873 (Fla. 1969), cert. dismissed, 401 U.S. 801, 91 S.Ct. 7, 27 L.Ed.2d 33 (1970). State v. Wadsworth, 210 So.2d 4 (Fla. 1968).
When the error affects a constitutional right of the defendant, the reviewing court may not find it harmless "if there is a reasonable possibility that the error may have contributed to the accused's conviction or if the error may not be found harmless beyond a reasonable doubt." Nowlin v. State, 346 So.2d 1020, 1024 (Fla. 1977). Even such "constitutional error," however, may be treated as harmless where the evidence of guilt is overwhelming. Jones v. State, 332 So.2d 615, 619 (Fla. 1976).
While it is error not to receive in evidence "all the circumstances attending an extrajudicial confession ... that the court may determine its admissibility and the jury consider its value," the error is harmless where substantially the same matters are presented to the jury through testimony of the same or some other witness. Denmark v. State, 95 Fla. 757, 761, 116 So. 757, 759 (1928); Baker v. State, 30 Fla. 41, 11 So. 492 (1892), overruled in part, Tipton v. State, 97 So.2d 277 (Fla. 1957).
At trial appellant testified that he went to the apartment he shared with Jane Albert on the afternoon of Monday, October 4, 1976 and in a bedroom found the body of James Stone. As he entered the room, he saw Jane Albert putting a knife down on a table. He said he proceeded to clean up the room, put the body in the box he had built for toys, and later removed it from the apartment and dropped it in the river. He said he assisted in covering up the evidence of the crime in order to protect Albert from prosecution and that he later confessed to the crime for the same reason.
Appellant's attorney then turned to the events leading up to his confession. After his arrest in California, he was questioned there by Jacksonville police officers. He testified that he did not tell them anything, but only "asked them how Jane and Stephanie were." He also asked where they were, and learned that they also were being questioned. Later he consented to being returned to Florida after he learned that Albert had returned there. He testified: "I just wanted to be close to her."
Appellant returned to Florida in custody on Friday, October 22. On the following Sunday, he testified, he was questioned for eleven or twelve hours. That night the detectives read him a statement they said Albert had made. He told the jury that he could not believe she had made the statement and he wanted to hear it from her. After several hours of questioning, he said, they allowed him to listen to her on a one-way telephone; he was not able to talk back to her on this telephone. After hearing her statement, he agreed to show them where the box had been dropped in the river.
Q Why did you agree to take them out to the bridge at that point?
A Because I decided to plead guilty.
Q Why?
A Because I didn't want to live. I was 
Q All right.
A I was  unless you lived my life you wouldn't understand.
Q Did you take them out to the bridge?
A Yes, sir.
Q You showed them, didn't you?
A I showed them approximately where I figured it was, about where the truck stopped when we dumped the box.
Q Why didn't you talk to Officer or Sergeant Miles before the following Friday?
A I was just going to plead guilty, and then on Thursday I saw a thing on the news with Mr. Greene and a lady reporter and they were asking 
Q Don't say what they said.

*655 A Anyway, it was about what they were going to do with Jane. It led me to believe that they hadn't given her immunity.
Q That they hadn't or they had?
A That they hadn't given her immunity. I had already decided  as a matter of fact, I tried to plead guilty the first day they took me to court and  but I had already decided to plead guilty, but when this news report came on I was still in doubt whether or not Jane was going to get immunity or not and I called Sergeant Miles.
Q You say you called. You called him direct?
A Well, I talked to the chaplain first. The chaplain said he was too busy. I got a guard at the jail. A guard is actually the one that called him. This guard got him to come over to the jail and he came over to the jail and he says, "Well, 
Q All right, sir. Who had you seen that week?
A No one except Sergeant Miles and Detective Starling.
Q Had you talked to anyone on the phone?
A I had talked to my mother two or three times, except they came up with  the phone doesn't come around to the cell for two or three days. They said the phone line was out of order on that side of the floor. So, there was two or three days I didn't talk to anyone. Besides that, no one  I put in for to get a lawyer when I first got into town. They took me to a bond hearing on Saturday, the 22nd. I had signed a piece of paper asking for a lawyer, but I never got a lawyer. Nobody ever came to me.
Q You never talked to a lawyer?
A No one ever came over to the jail from the Public Defender's Office or anyplace.
Trial transcript at 808-10.
The state's lawyer objected to any further questioning pertaining to whether appellant was represented by counsel or had asked for counsel during the interrogation that culminated in his confession. The prosecutor argued that any evidence going to the question of whether his confession was voluntary was irrelevant. Defense counsel argued that the line of questioning that he wished to follow was intended to elicit testimony going to appellant's state of mind at the time. The court ruled that there could be no further testimony of the circumstances surrounding interrogation. Then, appellant testified as follows:
Q Mr. Palmes, do you recall giving a statement on the 28th 
A Yes, sir.
Q  of October?
A Yes, sir.
Q Now, what you have told the Court today is different from that.
Can you tell us why you gave that statement at that time?
A To clear Jane so that nothing would happen to her. I was under the impression that she hadn't been given immunity at that time.
Q Why are you telling the story differently now?
A Because nothing can happen to her from what I understand; she has been given immunity and they can't prosecute her. If she hadn't been given immunity I wouldn't be here right now.
Trial transcript at 818.
Even though the court improperly sustained the objection, the defense was still able to present to the jury a substantial account of the operation of circumstances on appellant's state of mind at the time of his confession. This is an important factor in the determination of whether the error was harmless. Furthermore, the evidence of guilt was overwhelming and it is highly unlikely that a more complete account of the circumstances of the confession would have changed the jury's evaluation of the *656 question of guilt. We hold, therefore, that the error was harmless.
The Court has given careful consideration to appellant's other contentions pertainin to the judgment of conviction and finds them to be without merit. The verdict of the jury was supported by competent, substantial evidence and therefore we hold that the evidence is sufficient to support the judgment of conviction. We affirm the conviction.

IV.
We now come to the question of the propriety of the sentence of death. There was no jury recommendation because appellant waived his right to have the jury hear evidence on the question of sentence. One who has been convicted of a capital crime and faces sentencing may waive his right to a jury recommendation, provided the waiver is voluntary and intelligent. Upon finding such a waiver, the sentencing court may in its discretion hold a sentencing hearing before a jury and receive a recommendation, or may dispense with that procedure. State v. Carr, 336 So.2d 358 (Fla. 1976); Lamadline v. State, 303 So.2d 17 (Fla. 1974). The record shows that the court inquired into appellant's waiver and found it to be intelligent and voluntary.
Appellant contends that the record shows that the judge did not consider the evidence offered in mitigation. After adjudicating appellant guilty, the court set a time for the sentencing hearing and meanwhile ordered a presentence investigation. At the sentencing hearing, after hearing all the evidence and argument, the judge stated her findings, which she read from a pre-prepared order. Appellant argues this shows no consideration was given to his evidence and argument offered at that hearing. The fact that the judge recited findings from an order prepared before the final sentencing hearing does not compel the conclusion that she did not give the required consideration to the evidence presented by the defense. All of the court's findings of aggravating circumstances were based on evidence that was adduced at the trial proper. Thus there was nothing wrong with her having these findings and considerations in mind at the start of the sentencing hearing. The fact that the pre-prepared order found that there were no mitigating circumstances does not show that the judge did not consider the evidence and argument offered in mitigation. The recitation and filing of the sentencing findings merely indicate that the court concluded that nothing presented by the defense at the hearing required her to add to or change her pre-prepared findings.
A copy of the pre-sentence investigation report was provided to counsel for both parties before the sentencing hearing.
The judge found four aggravating circumstances. She found that appellant was previously convicted of a felony involving violence, section 921.141(5)(b), Florida Statutes (1977), that the murder of James Stone was committed "while the defendant was engaged ... in the commission of" the felony of robbery, id. § 921.141(5)(d), that the murder was committed for pecuniary gain, id. § 921.141(5)(f), and that the murder was heinous, atrocious, and cruel. Id. § 921.141(5)(h).
The finding that appellant was previously convicted of a felony involving violence to the person was based upon a conviction for manslaughter. The previous conviction was rendered pursuant to a plea of guilty to manslaughter in a prosecution initiated by an indictment charging first-degree murder. We therefore hold that the previous conviction supported the finding of this factor.
Under the circumstances of this case, the factor of commission in connection with a robbery and the factor of pecuniary gain are both based on the same aspect of the crime. Therefore, only one aggravating circumstance was established by these considerations. Provence v. State, 337 So.2d 783 (Fla. 1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). The improper double recitation of the factor, however, was harmless error. The judge found that there were no mitigating *657 circumstances, and on this review we approve her finding. Therefore it is beyond doubt that the weighing process was not affected injuriously to the appellant. For this reason the error does not require resentencing. Hargrave v. State, 366 So.2d 1 (Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979).
The finding that the murder was especially heinous, atrocious, and cruel, under the Court's previous constructions of this statutory factor, was amply supported by the evidence. See, e.g., Washington v. State, 362 So.2d 658 (Fla. 1978), cert. denied, 441 U.S. 937, 99 S.Ct. 2063, 60 L.Ed.2d 666 (1979); Funchess v. State, 341 So.2d 762 (Fla. 1975), cert. denied, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158 (1977).
The evidence was sufficient and there was no reversible error. Therefore we affirm the conviction of first-degree murder. There were three aggravating circumstances, supported by the evidence, and no mitigating circumstances. Therefore we also affirm the sentence of death.
It is so ordered.
ADKINS, BOYD, OVERTON, ENGLAND and ALDERMAN, JJ., concur.
SUNDBERG, C.J., concurs in result only.
NOTES
[1] In sustaining the prosecutor's objection, the judge stated:

Mr. Greene [the prosecutor] has objected to the line of testimony that was being given, we had argument before the bench, the court has had an opportunity to reflect on it, and the Court is going to sustain the objection in view of the fact that we had an evidentiary hearing on the motion to suppress and this is in substance the same material that was covered at that time at that hearing.
Trial transcript at 817.